UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| John Bennet, | Civ. No. 19-1639 (PAM/DTS) |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| Mayo Clinic, Mayo Clinic Hospital – Rochester, Does 1-10, | |
| Defendants. | |

This matter is before the Court on Defendants' Motion for Summary Judgment. (Docket No. 44.)  For the following reasons, the Motion is granted.

**BACKGROUND**

Plaintiff John Bennet suffered from hyperaldosteronism, "a condition involving excess secretion of the hormone aldosterone by the adrenal gland, which can contribute to hypokalemia (low potassium in the blood), hypertension, and cardiac arrhythmias such as atrial fibrillation."  (Def.'s Supp. Mem. (Docket No. 46) at 1.)  In 2008, Bennet's treating endocrinologist in Chicago, where he lived at the time, referred him to Dr. William Young at the Mayo Clinic in Rochester, Minnesota.  (Pl.'s Med. R. (Docket No. 48) at 25.)  Bennet subsequently traveled to Mayo for testing and to meet with Dr. Young.  A CT scan showed an adenoma, which is a benign tumor that can secrete excess aldosterone, in Bennet's left adrenal gland, and a "second nodule . . . too small to completely characterize but likely an adenoma as well."  (Id. at 27.)  Additional testing at Mayo in September 2008, revealed that Bennet's left adrenal gland was likely the source of excess aldosterone causing his

hyperaldosteronism.  (Id. at 23.)

After consulting with Dr. Young, Bennet elected to undergo a laparoscopic adrenalectomy of his left adrenal gland.  (Id. at 22.)  Dr. Young asked Dr. Clive Grant, an endocrine surgeon at Mayo, to perform the procedure.  On October 14, 2008, Bennet met with Dr. Grant regarding the adrenalectomy.  (Id.)  Dr. Grant informed Bennet that the surgery's goal was to address his hypokalemia and heart conditions and improve his hypertension, and Bennet consented to the surgery.  (Id.)  The next day, Dr. Grant performed the surgery and in his operative notes stated,

> [t]he adrenal gland itself was completely buried in fat and was not apparent. . . . a small remnant of adrenal gland fractured away from the main portion of the gland and retracted inferiorly.  We were able to excise all but a very small portion of adrenal gland, and the nodule identified by the preoperative CT scan was included in the resection, but was lost.

(Id. at 20-21.)  Dr. Grant did not resect the adenoma.  (Pl.'s Opp'n Mem. (Docket No. 56) at 8.)  Bennet recalls that, on the night of the surgery, Dr. Grant relayed to him that "we had a few problems, but we got it out."  (Bennet Dep. (Docket No. 47-1) at 6.)  The following day, October 16, 2008, Dr. Grant sent a letter to Bennet's Chicago endocrinologist summarizing the surgery and explaining that the adrenalectomy "was quite difficult but proceeded satisfactorily and we are hopeful that Mr. Bennet's hypertension will be significantly improved although it is quite unlikely that it will be normalized."  (Pl.'s Med. R. at 28.)  Dr. Grant enclosed the operative and pathology reports in the letter.  (Id.)  On October 23, 2008, Dr. Young also wrote to Bennet's Chicago endocrinologist, summarizing the procedure and noting that Bennet could reach out in the future.  (Id. at 29.)

Neither Dr. Grant nor Dr. Young discussed any continued care or treatment of Bennet, nor did Bennet expect to see them again.  (Bennet Dep. at 10-11.)  Indeed, Bennet did not meet with any provider in Mayo's endocrinology department again until December 2015, although he was seen in other departments in the interim.  In August 2009, Bennet returned to Mayo to consult with a cardiologist, who made an appointment for Bennet to see Dr. Young, but Bennet did not show up to that appointment or otherwise follow up with Dr. Young.  (Id. at 13.)  Bennet sought further treatment at Mayo for his heart conditions in 2010 and 2011.  (Pl.'s Opp'n Mem. at 14.)

Bennet returned to Mayo in December 2015, March and July 2016, and September 2018, regarding his aldosteronism.  (Pl.'s Med. R. at 3, 5-8.)  Ultimately, on June 10, 2019, Bennet underwent a cryoablation of his left adrenal gland (id. at 2), which he maintains cured his hyperaldosteronism.[1]  (Pl.'s Opp'n Mem. at 16.)  Because of his marked improvement after the cryoablation, Bennet came to believe that the 2008 surgery was not a success, but instead had worsened his hyperaldosteronism and hypokalemia.

Bennet brings alleges a single count of medical practice against Defendants Mayo Clinic, Mayo Clinic Hospital – Rochester, and Does 1-10.  Defendants move for summary judgment.

**DISCUSSION**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court

---

[1] The cryoablation technique was not available for adrenalectomies in 2008.  (Pl.'s Opp'n Mem. at 16.)

must view the evidence and inferences that "may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. Paine v. Jefferson Nat'l Life Ins. Co., 594 F.3d 989, 992 (8th Cir. 2010).

Under Minnesota law, a plaintiff has four years from the date the medical-malpractice cause of action accrues to commence a lawsuit. Minn. Stat. § 541.076(b). "Generally, the cause of action accrues when the physician's treatment for the particular condition ceases." D'Amaro v. Joyce, 297 F.3d 768, 770 (8th Cir. 2002). However, "when the alleged malpractice consists of a single act which is complete at a precise time, which no continued course of treatment can cure or relieve, and where the plaintiff is actually aware of the facts upon which the claim is based." Gulley v. Mayo Found., 886 F.2d 161, 163 (8th Cir. 1989). If this single-act exception applies, "the cause of action accrues at the time the plaintiff sustains damage from that act, absent fraudulent concealment, or at the time of the negligent act." D'Amaro, 297 F.3d at 770 (internal citations and quotations omitted).

4

Although the adrenalectomy was performed in 2008 and Bennet filed this lawsuit in 2019, he contends that the lawsuit is nevertheless timely.  Bennet argues that being seen by Mayo cardiologists in 2009, 2010, and 2011, tolled the statute of limitations because his heart conditions were affected by his hyperaldosteronism.  This argument is unavailing. Bennet provides no support for the proposition that seeing a specialist within a vast hospital system tolls the statute of limitations for a procedure performed by another physician in a different department in that hospital system years earlier.  While Bennet contends that he was "referred to Mayo as an entity," he offers no evidence to bolster this assertion.  (Pl.'s Opp'n Mem. at 23.)

Bennet provides one case to support suing the entire Mayo entity for malpractice, Offerdahl v. Univ. of Minnesota Hosps. & Clinics, 426 N.W.2d 425, 428 (Minn. 1988).[2] But Offerdahl was decided on "unique facts" and is readily distinguishable from this case. Id.  The plaintiff in Offerdahl was randomly assigned residents to treat her during her visits to the University Hopsital system; thus, the Minnesota Supreme Court found that she could sue the University Hospital entity for malpractice rather than one specific provider.  Id. Here, Bennet was not randomly assigned providers at Mayo, but was referred to Dr. Young and was subsequently treated by Dr. Grant.  (Pl.'s Med. R. at 25.)

Moreover, the patient in Offerdahl continued receiving treatment in the University Hospital system for the same issue following her allegedly negligent procedure.  Offerdahl, 426 N.W.2d at 426.  Not so here.  Drs. Grant and Young ceased treating Bennet after the

---

[2] At the hearing, Bennet acknowledged that Offerdahl is the only case that he was aware of in which an entire entity has been sued for malpractice.

2008 procedure, and Bennet conceded as much in his deposition.  (Bennet Dep. at 9-11.)
Notably, when a Mayo cardiologist set up an appointment for Bennet to see Dr. Young in
2009, Bennet did not attend that appointment and did not reschedule it.  (Id. at 20-21.)  The
record does not reflect that Bennet was continuously treated at Mayo for
hyperaldosteronism following his 2008 adrenalectomy.  Indeed, Bennet's medical expert
conceded that the heart conditions for which he received treatment at Mayo following the
2008 surgery did not necessarily result from his hyperaldosteronism.  (Williams Dep.
(Docket No. 60-4) at 4-5.)

Not only is Offerdahl factually distinguishable, it undermines Bennet's statute-of-
limitations argument.  There, the Minnesota Supreme Court found that the single act-
exception applied because the plaintiff's cause of action accrued when she was injured by
the allegedly negligent procedure, as it was precisely identifiable.  Offerdahl, 426 N.W.2d
at 429.  The single-act exception likewise applies here.  Mayo's alleged negligence
occurred at a definable point in time—October 15, 2008—and Bennet filed this lawsuit
nearly 11 years later.  Although Bennet eventually returned to Mayo for treatment of
hyperaldosteronism in 2015, the statute of limitations had long since lapsed.

Bennet further attempts to revive his claim by contending that Dr. Grant
fraudulently concealed that the 2008 surgery was unsuccessful.  While Bennet now
recounts that Dr. Grant told him that the "got it all" (see e.g. Pl.'s Opp'n Mem. at 7, 8, 31),
he previously testified that Dr. Grant told him "we had a few problems, but we got it out."
(Bennet Dep. at 6.)  That is consistent with the letter, and enclosed operative and pathology
reports, that Dr. Grant sent to Bennet and his Chicago endocrinologist explaining that "the

6

operation was quite difficult" and that part of the left adrenal gland remained. (Pl.'s Med. R. at 20-21, 28.) Further, Bennet's own expert surgeon testified that a subtotal adrenalectomy can effectively treat hyperaldosteronism. (Ornstein Dep. (Docket No. 60-3) at 3-4.) There is no genuine dispute of material fact as to the timeliness of Bennet's medical-malpractice claim.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that** Defendants' Motion for Summary Judgment (Docket No. 44) is **GRANTED** and this matter is **DISMISSED with prejudice. LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: <u>Wednesday, April 7, 2021</u>

<u>s/ Paul A. Magnuson</u>
Paul A. Magnuson
United States District Court Judge